N. H. WARREN & CO., APPELLANTS, V. JOHN RABEN,
APPELLEE.

[FILED NOVEMBER 11, 1891.]

1. **The contract** between the parties, set out at length in the
opinion, construed and applied to the evidence.

2. **Reference.** The decision of the case requiring the examination
of a long and involved account, reference is made to an expert
for that purpose.

APPEAL from the district court for Hamilton county.
Heard below before TIFFANY, J., sitting for NORVAL, J.

*Hainer & Kellogg*, for appellants, cited, as to the account:
2 Perry, Trusts, p. 474, sec. 821 ; *Blauvelt v. Ackerman*,
23 N. J. Eq., 495 ; *Albertson v. State*, 9 Neb., 431 ; Tay-
lor, Ev., 344 ; Powell's Ev., 294 ; 1 Greenl., Ev., sec. 79 ;
*Christy v. Douglas*, Wright [O.], 485 ; Abbott, Trial Ev.,
461 ; 1 Wait, A. & D., 193–4 ; *Langdon v. Roane*, 6 Ala.,
518. As to the construction of the contract: 2 Pom., Eq.
Jur., p. 480–2, secs. 957, 958 ; Story, Agency, sec. 210 ;
*Catron v. Shepherd*, 8 Neb., 315, 316 ; *Masters v. Free-
man*, 17 O. St., 323 ; *May v. Babcock*, 4 O., 334 ; *Sch.
Dist. v. Estes*, 13 Neb., 53 ; *Harbach v. Miller*, 14 Id., 13.

*A. W. Agee, contra*, cited, as to the construction of the
contract : 2 Parsons, Contracts, 547, 548, 550 ; *Greenstine*

*v. Borchard,* 50 Mich., 434; *Harvey v. Cady,* 3 Id., 431; *Brown v. Smith,* 11 Reporter [N. Y.], 510; *Hinnemann v. Rosenbach,* 39 N. Y., 100; *Long v. R. Co.,* 50 Id., 76; *Wiggin v. Goodwin,* 63 Me., 389; *Ripley v. Paige,* 12 Vt., 353; *Fitchburg v. Lunenburg,* 102 Mass., 358; *Elliott v. Weed,* 44 Conn., 19; *Cockburn v. Alexander,* 6 M., G. & C. [Eng.], 814; *Kirk v. Hartman,* 63 Pa. St., 97; *McCormick' v. Huse,* 66 Ill., 315; Wharton, Contracts, 658; Abbott's Trial Ev., 485; *Blackmer v. Davis,* 10 Reporter [Mass.], 365; *College v. Charlesworth,* 54 Mich., 523; *Olson v. Ins. Co.,* 29 N. W. Rep. [Minn.], 125; *Barney v. Newcomb,* 6 Cush. [Mass.], 56. As to what are profits: *Jones v. Davidson,* 2 Sneed [Tenn.], 447; *Andrews v. Boyd,* 5 Greenl. [Me.], 203; *People v. Supervisors,* 4 Hill [N. Y.], 23; *Masterton v. Mayor of Brooklyn,* 7 Id., 62; *Shea v. Donahue,* 15 Lea [Tenn.], 160; Lindley, Partnerships, 791, 806.

COBB, CH. J.

The appellants are a commission firm of grain dealers at Chicago, Illinois, and were owners of a grain elevator at Aurora, in this state, which the appellee leased and operated under a joint contract with the owners and on their joint account.

The contract was made October 20, 1883, between Nathan H. Warren, Cyrus T. Warren, and Charles C. Warren, composing the firm of N. H. Warren & Co., party of the first part, and John Raben, of Aurora, Nebraska, party of the second part; and the same " witnesseth, that for and in consideration of the agreement hereinafter set forth, the party of the first part agrees to furnish the free use of their horse-power elevator, fully equipped and ready for use, located at Aurora, Nebraska, to the said party of the second part. The said party of the second part agrees, in consideration of the free use of said elevator, to furnish all capital necessary to carry on and properly handle the grain business

at said Aurora, and shipping the grain so bought to said party of the first part, unless it can be sold to better advantage otherwise, the said party of the first part to charge at time of sale the regular commission as fixed by the Chicago board of trade. The said party of the second part agrees to keep a correct and true account and record of all weights, prices, and amounts paid for grain, and of all amounts received for sale of said grain. On or about the 1st day of January of each year the profits arising from such purchase and sale of grain shall be approximately declared, which shall be added to the total amount charged as commission by said party of the. first part on said grain, and the amount so found to be equally divided between the party of the first part and the party of the second part, and that on July 1 of each year a final statement of the year's business shall be made upon the same basis as the approximate statement above provided for. It is mutually agreed between the parties hereto that all the necessary repairs amounting to over $2 in each case shall be made by the said party of the first part, but all lesser repairs shall be made by the party of the second part. It is also mutually agreed that this agreement shall continue from year to year unless notice shall be given on or before the 1st day of May in either year by each party.

" In witness whereof, the parties hereto have set their hands and seal on the day and year last above mentioned.
"(Signed)　　　　　　N. H. WARREN & Co.
"JOHN RABEN."

The plaintiffs allege that they immediately delivered full possession of their elevator at Aurora to the defendant, furnished and equipped, ready for use, who took possession and transacted therein a large business in buying, selling, shipping, and storing grain from October 20, 1883, until December 2, 1884, when the contract was terminated by mutual consent; that during that time the business at Aurora, by the terms of the contract and the practice of

the parties, was under the sole charge and supervision of the defendant; that during the continuance of the business the defendant shipped to the plaintiffs numerous consignments of grain to be by them sold as provided by their contract, which grain the plaintiffs did so sell, charging therefor the regular commission as fixed by the Chicago board of trade, and duly accounted for such commission so charged, and for the proceeds of sales; and the plaintiffs aver that they have, at all times, performed every act on their part to be performed under the contract, and have paid various drafts for money drawn on them by the defendant on account of the shipment and sales of grain; an account of which is hereto attached, marked Exhibit A.

The plaintiffs allege that although by the contract the defendant was to furnish the capital necessary to carry on and properly handle the grain business at Aurora, and ship all the grain bought by him to them, unless the same could be sold to better advantage otherwise, yet he did, during the continuance of the business, overdraw his account with the plaintiffs more than $1,000, and while so overdrawn, in violation of his contract and in fraud of the plaintiffs' rights, and to prevent them from receiving the proceeds of the sales of grain sufficient to discharge the amount of his overdraft, failed to ship all grain to them, but, on the contrary, shipped a large number of car loads to W. F. Johnson & Co., commission merchants at Chicago, and to other parties, who had no other or better facilities for selling grain than the plaintiffs had, and who charged the same commissions on sales that the plaintiffs did, which was one cent per bushel, except on barley sold by sample, which was one and one-half cent per bushel; by reason of which the plaintiffs were defrauded of a considerable sum, the exact amount not known.

It is alleged that the defendant failed to keep a correct account of the weights, amounts, and prices paid for grain and that received for sales, and that he shipped to the

plaintiffs, and to others, large amounts of which no account was kept, or by him rendered to plaintiffs, the exact amount and the proceeds received by him not known; that the accounts of the business were so negligently and carelessly kept by the defendant that its condition and the amounts due the parties respectively cannot be determined therefrom; that the business involved many thousand separate transactions, with nearly as many persons, by defendant in purchasing grain in Aurora and vicinity, and selling to various parties in Chicago, Burlington, Iowa, and Omaha, and in other markets, by reason of the ·multiplicity of which and the neglect of the defendant to keep correct accounts the business is complicated, and it is impossible to state approximately the amount due the plaintiffs, but it is charged that a large profit was made, the whole of which, together with $1,199.80, the balance due plaintiffs, by Exhibit A, is in the hands of defendant, converted to his own use; that by the contract the defendant was obliged to render on January 1, yearly, an approximate statement of profits for the preceding year, to which was to be added the total amount of plaintiffs' commissions, the sum total to be equally divided between the parties; and on July 1, yearly, to make a final settlement of the year's business on the same basis, and though both dates have elapsed, and the business closed by mutual consent, the defendant, although urged to do so, has not submitted his accounts, nor any account pertaining to the business, except for repairs, $452.89, set forth in Exhibit A, and allowed as credit of January 1, 1885; that at the last mentioned date the defendant made a statement of business transactions, November 1, 1883, to January 1, 1885, comprising a summary of

Warren v. Raben.

PROFIT AND LOSS.

| | | | |
|---|---|---|---|
| Loss on wheat.......... | $3,610 67 | Profit on corn .............. | $2,780 20 |
| Loss on rye.............. | 22 66 | Profit on barley............ | 470 68 |
| N. H. Warren & Co., | | Profit on oats.............. | 274 19 |
|   one-half................ | 2,397 58 | Commissions............... | 2,541 15 |
| John Raben, one-half, | 2,397 58 | Loss and damage claim | |
| | |   on wheat, see sale 266.. | 186 66 |
| | | Rebate corn sale 415 ..... | 1,175 61 |
| | | Gain corn option ......... | 675 00 |
| | | Gain corn option ......... | 325 00 |
| | $8,428 49 | | $8,428 49 |

The plaintiffs allege that the defendant's statement is incorrect, showing $48,422.19 expended for wheat and $44,611.52 received therefor, with net loss of $3,610.87, when in fact there was expended less than $45,570, and was received by defendant a sum largely in excess of that represented, and it is denied that there was any loss on wheat; that his account shows $1,141.30 expended for rye, and $1,118.64 received therefor, making a loss of $22.60, when in fact he received $1,209.81, making a profit of $74.66; that his account shows $3,055.05 expended for oats, and $3,329.24 received therefor, making a profit of $274.19, when in fact he expended less than the amount stated and received more than that stated and made a profit of more' than $639.

The plaintiffs pray that an account be taken of their business, under their contract, from the commencement to the close, and of the moneys received and paid by the parties respectively; that the defendant may account for all the property, assets, effects, and profits of the business, and for the regular commission established by the Chicago board of trade on all sales of grain wrongfully shipped by the defendant to parties other than the plaintiffs, and that defendant be required by a decree of the court to pay plaintiffs whatever may be found due on such accounting.

Exhibit A is the plaintiffs' account current with defendant, showing the following summary of receipts and disbursements:

Warren v. Raben.

| 1883. | | | Dr. | | |
|---|---|---|---|---|---|
| | | | To total amount of drafts........ | $97,841 | 00 |
| Nov. | 30, | " | interest for Nov., 8 per cent, | 34 | 04 |
| Dec. | 31, | " | "        Dec................. | 57 | 61 |
| 1884. | | | | | |
| Jan. | 31, | " | "        Jan., '84.......... | 33 | 25 |
| Feb. | 29, | " | "        Feb................. | 12 | 05 |
| March | 21, | " | protest fees on draft.......... | 2 | 56 |
| March | 31, | " | interest for March............. | 13 | 83 |
| April | 30, | " | "        April.............. | 9 | 83 |
| May | 31, | " | "        May............... | 7 | 88 |
| June | 30, | " | "        June............... | 16 | 69 |
| Aug. | 19, | " | demand note, 12–27–'83...... | 1,400 | 00 |
| Aug. | 19, | " | "        3–3–'84........ | 2,000 | 00 |
| Aug. | 19, | " | interest on above notes....... | 148 | 54 |
| Sept. | 25, | " | demand note, 3–18–'84....... | 2,000 | 00 |
| Sept. | 25, | " | interest on above note........ | 84 | 88 |
| Sept. | 30, | " | "    for September........ | 22 | 68 |
| Oct. | 31, | " | "    "  October.......... | 62 | 39 |
| Nov. | 17, | " | demand note, 1–10–'84....... | 1,600 | 00 |
| Nov. | 17, | " | "        1–9–'84........ | 1,200 | 00 |
| Nov. | 17, | " | interest on note, 1–10........ | 109 | 15 |
| Nov. | 17, | " | "        "  1–9 ........ | 83 | 47 |
| Nov. | 24, | " | demand note, 2–16–'84....... | 1,600 | 00 |
| Nov. | 24, | " | interest on above note ....... | 99 | 90 |
| Nov. | 29, | " | interest for November ........ | 82 | 91 |
| Dec. | 31, | " | "        December ........ | 19 | 72 |
| 1885. | | | | | |
| Feb. | 19, | " | interest to date ................ | 26 | 03 |

$108,569  26

[Across the face in red ink:] (10,727.41.)

Warren v. Raben.

| 1883. | Cr. | | |
|---|---|---|---|
| | By total sales ........................ | $92,918 | 37 |
| Dec. 27, | " demand note, 8 per cent....... | 1,400 | 00 |
| 1884. | | | |
| Jan. 9, | " demand loan..................... | 1,200 | 00 |
| Jan. 15, | " demand note..................... | 1,600 | 00 |
| Jan. 21, | " overdraft ........................ | 998 | 75 |
| Feb. 16, | " demand note, 8 per cent ...... | 1,600 | 00 |
| March 3, | " demand note.................... | 2,000 | 00 |
| March 18, | " demand note..................... | 2,000 | 00 |
| April 3, | " demand note..................... | 1,901 | 55 |
| July 31, | " interest on account, July, '84.. | 3 | 12 |
| Aug. 30, | "          "          Aug., '84.. | 7 | 36 |
| Sept. 1, | " freight on boiler................. | 66 | 40 |
| Sept. 9, | " P. & S. 3,408.................... | 77 | 53 |
| Nov. 24, | " P. & S. 4,854................... | 675 | 00 |
| Nov. 24, | " P. & S. 55 ...................... | 325 | 00 |
| Dec. 1, | " repairs on elevator.............. | 452 | 81 |
| Feb. 19, | " commissions charged, | | |
| | $2,541 15 | | |
| 19, | " one ½ profit......... 2,397 58 | | |
| | | 143 | 57 |
| | By balance.......................... | 1,199 | 80 |
| 1885. | | $108,569 | 26 |
| June 12, | By subsequent sale 1,374 ........ | 4 | 50 |
| | Supplemental balance due... ..... | $1,195 | 30 |

[Across the face in red ink :] (14,451.09.)

The defendant answered, admitting the contract set forth and alleging that during all of the time in pursuance of it, and since, he has fully complied with every condition of it, but denies that the plaintiffs have complied with its conditions on their part, and sets up that the plaintiffs, in order to induce defendant to enter into the contract, represented that they had all the facilities necessary to sell, and could,

and would, sell grain for defendant, in Chicago, for as high a price and to as good an advantage as that of any other commission merchant; and relying on such representations, defendant entered into the contract, when, in fact, such representations were false, and the plaintiffs could not and did not sell the grain shipped to them by defendant at as high a price as other commission merchants would have sold it, but sold the same at a lower price, causing damage and loss, no part of which has been paid.

Defendant denies that Exhibit A is a true statement of accounts, or that it shows all just credits to which he is entitled; denies that the charges against him are true and just, and alleges that the various charges of interest, amounting to $924.45, the plaintiffs are not entitled to receive or to have any part thereof; that the plaintiffs never had any account or demand against him on which they were entitled to demand or receive interest. He denies that the account shows all the money received by the plaintiffs on account of sales of grain shipped by defendant, and alleges that the plaintiffs have wrongfully deducted from the proceeds of sales various sums for insurance, interest, and storage, amounting to $879.54, and refuse to pay over to or credit defendant with any part of the money wrongfully deducted from sales of grain shipped as stated, and which the plaintiffs have converted to their own use; that they deducted from the proceeds of sale large sums in addition to that necessary to pay the cost of freight, and have wrongfully converted the same to their own use; that the defendant paid and expended for the use of the plaintiffs, $388.51, no part of which has been paid or credited to defendant.

Defendant denies that he shipped grain to any other person or persons to prevent the plaintiffs from receiving the same, or their commissions thereon, or that his account with the plaintiffs was overdrawn, or that he was indebted to them in any sum of money, but admits that he shipped a considerable amount of grain to W. F. Johnson & Co.,

commission merchants, at Chicago, and to other persons, as he claimed to have the right to do, under his contract, for the reason that he would thereby sell the same to better advantage and for higher prices than by shipping the same to plaintiffs; and denies that the plaintiffs are entitled to any commissions or profits on grain sold or shipped to any other person; and denies that he has failed to keep a correct account of the weight of grain bought and of the prices and amounts paid therefor, or received by him for the sales of grain, but alleges that he has kept a correct and true account thereof; and denies that any profit was made on the grain bought and shipped to the plaintiffs by defendant, or that he has any money or profit of any kind belonging to the plaintiffs, or in which they have any interest.

During the continuation of the contract the defendant was compelled to expend, in addition to that paid for grain, the sum of $2,226.75 for shelling corn, and for labor in carrying on the business of buying, handling, cleaning, and shipping the grain bought under the contract, during which time he devoted all his time, labor, and skill to the prosecution of the business, which services were worth $1,300.

The defendant claims a credit on such account of $3,526.75, which the plaintiffs wrongfully refuse to give. Defendant has at all times been ready to make a full and fair settlement of all the business transactions of the plaintiffs, and alleges there is due from the plaintiffs to him $3,000 which they refuse to pay over to defendant.

That under the contract between August 1, 1884, and October 1, 1884, defendant bought and shipped to plaintiffs 20,000 bushels of No. 2 wheat, directing the plaintiffs to sell whenever they could at seventy-eight cents per bushel, the price of which subsequently advanced to eighty-two and one-half cents per bushel, and which could have been sold at that price, and though ordered and requested by defendant to sell, the plaintiffs neglected to do so, and care-

lessly held the same until the price in the market fell to seventy-four cents per bushel, at which price the wheat was sold, to the damage of defendant $1,700. By reason of the withholding of the wheat from sale contrary to the instructions of the defendant the plaintiffs were compelled to pay out $693.31 for storage, which they wrongfully deducted from the proceeds of the sale of wheat, which sum they have wrongfully withheld and converted to their own use; also the further sum of $104.47 for insurance on the wheat contrary to the orders of defendant, together with the sum of $81.76 for interest wrongfully charged against defendant, all of which sums the plaintiffs have withheld from the defendant, and have converted the same to their own use.

Defendant denies that he paid for wheat bought and shipped to the plaintiffs, under the contract, a less sum than $48,422.19, and alleges that the cost, including buying, handling, cleaning, and shipping, was greatly in excess of that sum, and that he has received for the wheat $44,811.52, and no more, leaving a loss to him of $3,610.67; and denies that he paid for oats less than $3,055.05, and alleges that he did pay the sum of $3,073.95 for the oats shipped under the contract.

After the business had been entered upon, the plaintiffs proposed that the defendant should buy and crib at Aurora a large amount of corn, hold it for a rise in the market and ship it to the plaintiffs, unless disposed of otherwise to better advantage, both parties to share the commissions and profits as upon other grain, and the plaintiffs offered and agreed to furnish the capital to buy, crib, and hold the corn, which offer was accepted, and in accordance with the plaintiffs, proposition a large amount of corn was bought and stored in cribs at Aurora; that at various times plaintiffs applied to defendant to assist them in raising money to pay for the same, and it was agreed, in order to enable plaintiffs to borrow money, that defendant from

time to time should execute his promissory notes to the plaintiffs, and attach them as security for the payment of crib receipts, being receipts for corn then in store at Aurora in possession of defendant.  It was agreed that the notes were for the sole purpose of enabling the plaintiffs to use them with the crib receipts attached as collaterals for money borrowed, and whenever the corn covered by the receipts should be shipped to the plaintiffs they should take up the notes and receipts and return them to defendant. In pursuance of the agreement defendant executed to plaintiffs various promissory notes, each so secured, for the various sums mentioned as "demand notes," none of which were in fact loans from the plaintiffs to the defendant, and the plaintiffs are not entitled to charge or receive interest on any of said sums, which were wholly for the accommodation of the plaintiffs to enable them to borrow money as stated.   Among the same was one for $1,901.55 credited to the defendant in plaintiffs' account dated April 3, 1884, described as "demand loan, 8 per cent," which was delivered to the plaintiffs with crib receipt for corn in defendant's possession at Aurora.   After the delivery of the note and crib receipt to plaintiffs, defendant shipped all the corn mentioned and included in the receipt to the plaintiffs, who sold the same, and on April 3, 1884, received from the sale, after paying all freight and other expenses of shipping and handling the same, a sum more than sufficient to pay the note, and retained the same, applying it to the payment of the note, and credited defendant on said day with $1,901.55 on account of the note, and never accounted for the proceeds of the sale in any other manner. The plaintiffs have charged defendant with all the money received by him for any purpose and the sum of $1,901.55 is included, though the same has been fully paid, and was used in buying and cribbing corn shipped to the plaintiffs and sold by them, and the proceeds, after paying the note, was converted to their own use.   The plaintiffs still retain

the note in possession and refuse to surrender it to defend-
ant.

Defendant did not, on January 1, 1885, or at any other
time, make to the plaintiffs a statement of the condition of
the business under the contract as alleged, but now asks
that an account be taken of the business done under the
contract and of the moneys received and disbursed by the
parties in the conduct of the business; that the plaintiffs
be compelled to account for all the proceeds of the sale of
grain shipped by the defendant, and for the loss sustained
on wheat shipped by defendant by reason of the negligence
and carelessness of the plaintiffs and their refusal to follow
the instructions of the defendant as to the sale of the same;
that the plaintiffs be decreed to cancel and surrender the
note for $1,901.55; and to pay any sum which may on
an accounting be found due to defendant.

The plaintiffs replied denying each and every allegation
of the answer, excepting such as are expressly admitted in
the petition by them in this cause.

There was a trial to the court, a jury having been
waived, on June 7, 1887, and the court having taken the
cause under advisement, on June 18, 1888, the court found
in favor of the defendant and that there was due from the
plaintiffs to the defendant the sum of $2,611.99 on account
of the transactions between the parties under the contract
of October 20, 1883, for which sum judgment was ren-
dered, and from which the plaintiffs appealed to this court.

The cause having been tried by the district court with-
out a jury, we are not informed from the record what con-
struction was placed upon the terms of the contract by the
trial court, except in so far as a construction may be in-
ferred from the judgment. And this from the multifari-
ous character of the controversy is not clearly indicated;
certainly not sufficiently to relieve the court of the duty of
declaring its legal interpretation. In this duty, I am im-
pressed of the conviction that the intention of the parties

to the contract is not literally expressed by its terms. First, the plaintiffs are to furnish defendant the free use of their elevator at Aurora, in consideration of defendant's furnishing all capital necessary to carry on and properly handle the grain business at Aurora and shipping the grain so bought to the plaintiffs. In addition to this, it seems clearly the intention of the parties that by means of the capital to be furnished by the defendant from time to time, as required in the business, and the necessary men and animals to be employed by him, he should carry on the business of buying grain, elevating, and shipping it to Chicago, with all other incidental acts necessary to the carrying forward of such business; that the employment of this capital and its management were to be taken as the consideration for the use of the elevator. The capital employed was to remain the property of Raben as the elevator remained the property of N. H. Warren & Co., the use of either being for the purposes of the *quasi*-partnership formed by the contract between the parties. The plaintiff's object was twofold : First, in the profit of buying grain at Aurora and consigning it to them at Chicago, using their own elevator as capital and labor for that purpose; second, to increase their business as commission merchants at Chicago, of receiving grain and selling it on the board of trade of that city. The defendant's object was to have the necessary facilities for handling, elevating, and shipping grain at Aurora, as well as to insure the safety and advantageous disposal of shipments to be consigned to an experienced and responsible firm of grain dealers in Chicago. It is provided that all grain bought should be shipped to the plaintiffs "unless it could be sold to better advantage otherwise, the plaintiffs to charge at time of sale the regular commission as fixed by the Chicago board of trade," and that the defendant should "keep a correct and true account and record of all weights, prices, and amounts paid for grain, and of all amounts received for sale of grain;" that on

January 1 of each year the profits arising from the purchase
and sale of grain shall be approximately prepared, to be
added to the total amount charged as commissions by
the plaintiffs, and the amount be equally divided between
the parties; that on July 1 of each year a final statement
of the year's business shall be made upon a like basis for
settlement between the parties.

It will scarcely be questioned that it was the intention
that all grain purchased under the contract, if shipped to
Chicago for sale, should be consigned to the plaintiffs, for
undoubtedly they possessed facilities for selling at the
highest market price and on the most advantageous terms.
But the contract did contemplate and provide a condition
of exemption in the words "unless it can be sold to better
advantage otherwise" than by shipping to the Chicago
market. Yet it does not follow that in such case, the
grain having gone to another market and sold, the plaint-
iffs would not be entitled to their share of the profits, if
any there were, though they would not be entitled to con-
structive commissions on sales. But upon shipments to a
rival firm, sold in the Chicago market, as is admitted by
the defendant, the plaintiffs would be entitled to an equal
share of commissions and profits.

It was also provided that the plaintiffs should make
all necessary repairs of elevator above the sum of $2.
Though not expressly stated, the "repairs" provided for
could only refer to the elevator, the means of operation,
and one consideration of the contract. Early in the cor-
respondence of the parties, preserved in the bill of excep-
tions, the plaintiffs, referring to "the cribs," in reply to
defendant's communication of October 24, 1883, write "If
any of them are badly wrecked they had better be taken
down and the lumber sold. We do not know that you
care to have so much crib room." And in their letters of
December 3, 5, 6, and 7, following, they advise him to run
partitions lengthwise through the cribs, dividing each into

three apartments, filling those outside first, and when the corn becomes dry fill the center. Construing these instructions with the tenor of the contract, it is apparent that the cribs, their changes, additions, and repairs, must be considered consubstantial with the elevator, and the cost and expenses chargeable against the plaintiffs.

It appears from the evidence that during the defendant's possession of the elevator the plaintiffs changed it from horse to steam power, built an engine house, and put in a stationary engine at their own expense, which the defendant testifies they had mainly paid, but claimed that a portion of it had been paid by him on their account, for which he still claimed to be reimbursed, and if valid would constitute a counter-claim against the plaintiffs.

In the pleadings and bill of exceptions an account between the parties is exhibited by the plaintiffs and two or more set up by the defendant. These accounts differ widely, and it is clear from the evidence that neither contains a full statement of all the transactions of the parties under the contract and within its purview.

The several matters in controversy may be summarized as follows:

I. The claim of defendant to charge up against the profits and commissions of the business the expense of receiving and handling the grain, including a salary to himself while employed in the business.

II. The plaintiffs' claim to charge up against the profits and commissions charges for storage and insurance of grain in store awaiting a favorable market.

III. The defendant's claim for damages for losses occasioned by plaintiffs' negligence in selling grain on defendant's order until the price had fallen in the market.

IV. The plaintiffs' claim of interest on defendant's overdrafts for money used as capital in the business.

V. The defendant's claim that the "demand notes and loan" by him to plaintiffs as collateral to the "crib re-

ceipts" of corn in the crib at Aurora, were made by him for the accommodation of the plaintiffs, and not chargeable with interest.

VI. The defendant's claim for payments for the permanent improvement of the elevator, building engine house and placing the engine, lumber, and material for corn cribs.

VII. The plaintiffs' claim to one-half of the profits and commissions on grain sold by defendant "otherwise" than in the Chicago market, and on all grain shipped to other parties in Chicago by defendant, added to the profits and commissions provided in the contract to be equally divided between the parties.

VIII. The state of accounts between the parties, and herein the discrepancies between the plaintiffs' and defendant's accounts exhibited, and those, if any, between the defendant's separate statements.

From the contract and the apparent intention of the parties, I reach the conclusion that the expense of receiving, handling, and shipping the grain, including the wages of workmen and laborers, is chargeable against the profits and commissions of the business; but that no salary or personal compensation to defendant for his time or services is due. These services were primarily employed in the enterprise, by the contract, without which it had neither beginning nor progress, and his compensation was to be found in the account of the net profits and commissions.

2. As to the plaintiffs' claim for money paid for storage and insurance of grain shipped to them, it cannot be determined by the terms of the contract, for it does not appear that the storage of grain in Chicago was contemplated by the parties to the contract. There is, however, some evidence in the letters and testimony of the parties as to quantities of grain shipped from time to time by defendant, and held in store by plaintiffs upon the order or by the assent of defendant, awaiting a rise in the market. If this appears by a preponderance of the evidence,

it will follow that such storage, and probably policies of insurance in such cases, would be chargeable against the profits and commissions.

The defendant alleges that under the contract, between August 1 and October 1, 1884, he shipped to plaintiffs more than 20,000 bushels of wheat, No. 2, which he directed to be sold on the first market at seventy-eight cents per bushel; that subsequently the price advanced to eighty-two and one-half cents, at which time the plaintiffs could have sold the whole at eighty-two cents per bushel, but did not, and negligently and carelessly withheld the wheat from sale until the market had fallen to seventy-four cents per bushel at which price the wheat was sold, by reason of which the plaintiffs received, and accounted to defendant, $1,700 less than they should have obtained, and less than he is entitled to credit for.

It is doubtful, under the contract, that defendant had the absolute right to determine the time at which wheat should be held or sold without reference to the assent of the plaintiffs; but such doubt is probably put at rest by evidence that the plaintiffs, on one or more occasions during the progress of the grain business, held wheat in store awaiting the defendant's order to sell; so that probably the evidence is conclusive that the plaintiffs conceded the defendant's right to determine absolutely the time and condition of the market at which the wheat should be sold. Assuming this evidence, it would follow that if it appears that a quantity of wheat was in the hands of plaintiffs, ordered to be held for a market of seventy-eight cents, and then to be sold, and meanwhile the price advanced to seventy-eight cents, but through negligence or willful disregard of defendant's order it was withheld from sale until the market price had fallen to seventy-four cents, when the plaintiffs sold it, they will be held to account for it at seventy-eight cents per bushel.

The plaintiffs' claim for interest on the overdrafts of the

· defendant is not within the contract. The defendant was
to furnish the capital necessary to carry on and properly
handle the grain business at Aurora, and shipping the
grain to the plaintiffs. This was the consideration for the
use of the grain elevator. Doubtless it employed the use
of considerable sums of money to carry on the business at
Aurora. Had the defendant had sufficient of his own, its
use in the business would have been worth the current rate
of interest on time loans, and hence the capital to be em-
ployed, in the equal business, was deemed a sufficient con-
sideration for the use of the elevator. If the defendant
was without sufficient capital of his own, which he admits
in his correspondence, it was nevertheless his obligation
to furnish it. And wherever he might supply it from,
whether from loan offices at Aurora or Chicago, whether by
the plaintiffs' indorsement as surety or otherwise, he would
have to pay the current rate of interest therefor. And so,
also, if the defendant, at any time during the course of the
business, for the want of money on hand to pay for grain
as it was offered, made drafts on the plaintiffs in excess of
cash to his credit in their hands, and such drafts were paid
by plaintiffs, creating an overdraft account against defend-
ant, the plaintiffs would be entitled to the amounts with
legal interest. Where the amount of overdrafts, or debtor
balance, fluctuates and varies from day to day, it is custom-
ary to cast interest daily at the close of business, weekly
at the close of the week, or monthly at the close of each
month. There is evidence tending to support the above
propositions, but not having opportunity to determine its
sufficiency, the facts are not now passed upon.

Fifth—The defendant claims that the demand notes ex-
ecuted to the plaintiffs, and secured by bills of sale on cribs
of corn at Aurora, were such accommodation notes, for the
benefit of the plaintiffs, that no interest thereon, or for
money obtained thereon, was chargeable against him, or to
the grain business. It will be seen from the evidence that

two of such bills of sale, accompanying corresponding notes of defendant, forwarded to plaintiffs and credited in their account with defendant as so much money, were introduced in evidence as exhibits of a considerable number of the same kind. These bills and notes contain a promise by defendant that N. H. Warren & Co. should, the corn implied being shipped to them, sell the same, and retain from the proceeds the freight, insurance, and customary charges for hauling, their advances of money and interest thereon at eight per cent, and one per cent per bushel commissions, the remainder to be paid to defendant. These obligations were acknowledged by defendant and recorded in Hamilton county. They were to be used to secure the plaintiffs, and such banks or other parties as might advance money on them, to enable defendant to extend his purchase of corn. This purchase was an element of the grain business which he agreed to carry on at Aurora in connection with the plaintiffs and for which he agreed to furnish the necessary capital. The papers termed " crib receipts," to secure the demand notes to the plaintiffs, was the defendants method of supplying capital to carry on the business, and was for his own accommodation, rather than that of the plaintiffs, who were under no contract to furnish capital.

As we have seen, the contract provides that repairs amounting to more than $2 shall be paid by the plaintiffs, and that this provision will be held to include all repairs and additions to corn cribs, so that if the evidence shall show that the defendant supplied money, material, or labor for repairing corn cribs, building additional ones upon the ground occupied by the plaintiffs' cribs and elevator, or in the permanent improvement of the elevator plant, he will be entitled to the sum as a credit in the statement of accounts between the parties.

Seventh—If the evidence shows a profit upon grain bought by defendant, not shipped to plaintiffs, such profit should be added to that of the general business, and divided equally between the parties.

As a correct and just decision of the cause involves the critical examination of a voluminous record, embracing in great part the correspondence of the parties, their accounts, and the defendant's testimony, consisting of 273 pages, the judgment of the district court is reversed *pro forma* and the cause referred to J. A. Marshall, Esq., sole referee, to state an account between the parties from the pleadings and evidence, upon the construction of the contract and law, as stated in this opinion, and report the same to this court on or before December 15, 1891. And said referee is especially directed to find and report:

1. The amount actually paid and expended by the defendant in the purchase of grain actually shipped to the plaintiffs.

2. The amount paid and expended by the defendant as expenses at Aurora in receiving, handling, elevating, and shipping grain consigned to the plaintiffs, including the wages of men necessarily employed in shelling corn, cleaning wheat, or other grain, and in operating the elevator.

3. The amount paid by plaintiffs for storage and insurance on grain shipped by defendant, designating the amounts paid on account of each.

4. Whether at any time during the continuance of the contract, and while there was a quantity of wheat No. 2 in the hands of the plaintiffs, shipped by defendant, he gave to them an absolute or unqualified order to sell such wheat wherever they could at seventy-eight cents per bushel; or whether the price of that grade of wheat in Chicago, after the giving of such order, arose to seventy-eight cents per bushel, and the plaintiffs, through negligence, failed to comply with the order and failed to sell the wheat until the price had declined to seventy-four cents per bushel; and if so, how much wheat had the defendant in the hands of the plaintiffs at the date of such order, and how much money was lost to defendant by reason of such negligence by the plaintiffs?

Warren v. Raben.

5. Whether during the progress of business under the contract the defendant drew drafts upon the plaintiffs, which were accepted and paid, in excess of money in their hands due to him as proceeds of grain sold for him, under a promise, express or implied, to pay interest on such overdraft; and, if so, at what rate of interest, and what is the gross amount due the plaintiffs on account of such interest?

6. The amount actually paid by defendant for material or labor expended in repairing the elevator named in the pleadings in excess of $2 in any instance, or for corn cribs, or for building new cribs upon premises adjacent to the plaintiffs' elevator and cribs, or in the alteration and change of the elevator from horse to steam power, or other permanent improvement thereof.

7. The amount, if any, of the profit on grain bought by defendant and not shipped to the plaintiffs, including that shipped to other parties in Chicago.

8. The amount of commissions at the rate of the Chicago board of trade upon all grain bought by defendant and shipped to parties in Chicago other than the plaintiffs.

9. The gross amount of profits, if any, on all grain bought by defendant and shipped to plaintiffs.

10. The gross amount of commissions at the rate mentioned upon all grain shipped by defendant to the plaintiffs and sold by them.

Upon the coming in of the report of the referee, and its approval, judgment will be rendered in this court.

JUDGMENT ACCORDINGLY.

THE other judges concur.